UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AVERY FOSTER,

                 Plaintiff,

                                      Case Number 04-10325-BC

v.                                      Honorable David M. Lawson

FEDERAL EXPRESS CORPORATION,

                 Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND DENYING MOTIONS *IN LIMINE* AS MOOT**

       The plaintiff, who worked for defendant Federal Express Corporation for about twelve years, filed an action alleging race discrimination and breach of implied contract after he was fired for falsifying his time card. Following procedural motions and a period of discovery, the defendant moved for summary judgment under Federal Rule of Civil Procedure 56(c). The plaintiff opposed the motion, and the Court heard oral argument from counsel on August 1, 2006. The Court now finds from the facts viewed in the light most favorable to the plaintiff that no employment contract existed between the plaintiff and the defendant that limited termination to just cause; rather the plaintiff was employed at will. Even if such a contract did exist, the plaintiff's termination was justified because the plaintiff was found to have falsified his time card, which constitutes cause for termination. There is no evidence suggesting the plaintiff was terminated due to his race, and the defendant has articulated a legitimate, non-discriminatory reason for the termination that the plaintiff cannot show is pretextual. Finally, although the plaintiff has not filed a motion to amend his complaint, he has suggested that an amend is appropriate to allege retaliation. However, the Court

declines to allow the plaintiff to amend because the effort would be futile.  The Court, therefore, will grant the defendant's motion for summary judgment and dismiss the case.

I.

The plaintiff was hired by the defendant on September 23, 1990 as a part-time courier.  He worked from a Federal Express office in Saginaw, Michigan.  At some point, the plaintiff was transferred to Georgia, then to Las Vegas, and finally to Seattle, Washington.  The dates of these transfers are not provided in the complaint or any of the motion papers.  The plaintiff alleges that he was terminated on November 21, 2002 while working in Seattle.

The plaintiff returned to Michigan and filed an action in the Saginaw County, Michigan circuit court alleging that the defendant's actions violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.201 *et seq*.  The plaintiff also claimed his termination breached an implied contract.  The defendant removed the matter to this Court alleging both federal question and diversity jurisdiction, and then moved to dismiss.  The Court dismissed the Title VII claim because the plaintiff failed to exhaust administrative remedies.  The Court held that the remaining state law claims should be decided under Michigan law instead of the law of the State of Washington.

The ensuing discovery discloses that when the plaintiff was hired by Federal Express in September 1990 as a courier, he interviewed with George Geisenhaver, a senior manager.  The plaintiff testified at his deposition that he did not discuss termination procedures with Mr. Geisenhaver during the interview, and he was not told by any person that he could only be terminated for cause.  Under questioning from his attorney, the plaintiff testified that he discussed

job security with Mr. Geisenhaver, who told him he would always have a job with Federal Express as long as he was a good worker.

The plaintiff signed an employment agreement with Federal Express as part of his employment application. The last page of the employment agreement contains a number of legal provisions, including the following:

> I ALSO AGREE THAT MY EMPLOYMENT AND COMPENSATION CAN BE TERMINATED WITH OR WITHOUT CAUSE AND WITHOUT NOTICE OR LIABILITY WHATSOEVER, AT ANY TIME, AT THE OPTION OF EITHER THE COMPANY OR MYSELF. I further understand that no manager or representative of the Company, other than the CEO, COO or other senior vice-president designated by the CEO, has any authority to enter into any agreement for employment with me for any specified period of time or to amend this agreement in any manner. Any such amendments shall be in writing. Nothing in this agreement or any other communication from the Company shall abrogate this employment-at-will status.

Def.'s Mot. Summ. J. Ex. C, Foster Dep. Exhibits (Ex. 5) at 21, ¶ 11.

After the plaintiff was hired by Federal Express, he received copies of the employee handbook on several occasions when updates or changes were made, and he acknowledged receipt of the handbooks in writing. The first written acknowledgment that the plaintiff signed provided: "I, Avery Foster, have received the Federal Express Handbook on 9-29, 1990. I understand it is not a contract and the information provided may need to be changed by the company from time to time." Def.'s Mot. Summ. J. Ex. C, Foster Dep. Exhibits (Ex. 6) at 22. Subsequent forms were more detailed. On December 29, 1993, the plaintiff signed the following form:

> The Company wants you to understand that *The Federal Express Employee Handbook* should not be considered a contract of employment, nor should *The Federal Express Employee Handbook's* provisions be read or implied to provide for one. Your specific rights as an employee are governed by the Employment Agreement you signed in your employment application. For more specific guidelines, refer to the PEOPLE manual and Your Employee Benefits book. Official personnel policies, as found in the PEOPLE manual, are referenced throughout the

-3-

Employee Handbook and in the index.  Your manager will make the PEOPLE manual available to you upon request and answer any questions you may have about policies and procedures.  The Company provides the Guaranteed Fair Treatment Procedure (GFTP/EEO Process) to resolve employment disputes and problems quickly.  Employees are therefore expected to use the GFTP to resolve all work-related disputes.

I understand that *The Federal Express Handbook* contains guidelines only and that the Company can modify this publication by amending or terminating any policy, procedure, or employee benefit program at any time.  I understand that the information in the 1993 The Federal Express Employee Handbook supersedes all information in previous editions to the extent it is inconsistent with this edition.  All information in previous editions inconsistent with this edition is expressly revoked.  I further understand that no manager or representative of the Company, other than the CEO or a senior vice president designated by the CEO, has any authority to enter into any agreement modifying this publication in any way, or to enter into an agreement of employment with me for any specified period of time.  Any amendment or agreement, if made, shall not be enforceable unless it is in writing and signed by me and the CEO or designated senior vice president.  I understand this publication applies to all employees except those employees whose terms and conditions of employment are governed by a collective bargaining agreement.

I have read and fully understand the above statement and have received a copy of The Federal Express Handbook on 12-29-93.

Def.'s Mot. Summ. J. Ex. C, Foster Dep. Exhibits (Ex. 7) at 23.  The plaintiff signed a similar form on March 26, 1997.   The plaintiff most recently signed such a form on February 20, 2002.  That form states:

*The FedEx Express Employee Handbook* is not a contract of employment, nor should its provisions be read or implied to provide for one.  Your specific rights as an employee are governed by the Employment Agreement you signed in your employment application.  For more specific guidelines, refer to the *PEOPLE Manual* and *Your Employee Benefits book (YEB)*.

Official personnel policies, as found in the *PEOPLE Manual*, are referenced throughout the Employee Handbook and in the index.  Your manager will make the *PEOPLE Manual* available to you upon request and answer any questions you may have about policies and procedures.  The Company provides the Guaranteed Fair Treatment Procedure (GFTP/EEO Process) to resolve employment disputes and problems quickly.  Employees are therefore expected to use the GFTP to resolve all

-4-

work-related disputes.  The Open Door Process may be used to address other concerns.

> *The FedEx Express Handbook* contains guidelines only and the Company can modify this publication by amending or terminating any policy, procedure, or employee benefit program at any time.  The information in the 2002 *FedEx Employee Handbook* supersedes all information in previous editions to the extent it is inconsistent with this edition.  All information in previous editions inconsistent with this edition is expressly revoked.  No manager or representative of the Company, other than the CEO or a senior vice president designated by the CEO, has any authority to enter into any agreement modifying this publication in any way, or to enter into an agreement of employment with you for any specified period of time.  Any amendment or agreement, if made, shall not be enforceable unless it is in writing and signed by you and the CEO or designated senior vice president.  This publication applies to all employees except those employees whose terms and conditions of employment are governed by a collective bargaining agreement.

Def.'s Mot. Summ. J. Ex. C, Foster Dep. Exhibits (Ex. 9) at 25.

Federal Express's policies and procedures are contained in the Federal Express People Manual, which is periodically updated.  According to the defendant, when the People Manual is updated, all policies and memoranda are superseded and replaced by the new policies.  The People Manual was updated in May 2002 and November 2002.  It appears that the November 2002 People Manual was in effect at the time of the plaintiff's termination.  The People Manual has a section labeled "Employment at Will," which states:

> The employment relationship between the Company and any employee may be terminated at the will of either party as stated in the employment agreement signed upon application for employment.  As described in that agreement, the policies and procedures set forth in this manual provide guidelines for management and employees during employment but do not create contractual rights regarding termination or otherwise.

Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 10, 45.

Section 2-5 of the People Manual, entitled "Acceptable Conduct," contains a non-exclusive list of conduct that could "result in severe disciplinary action up to and including discharge," which includes:

> • Deliberate falsification of applications or other Company-related documents, including electronic records.

Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 6, 41.  The Manual discusses various forms of discipline the company make take, including counseling:

> When an employee receives any form of counseling, i.e., a verbal counseling, or a written counseling, the manager must enter the information into the Online Documented Compliment/Counseling (OLCC) system in PRISM.  After its entry, the employee must immediately log into the Online Documented Compliment/Counseling Acknowledgment (OLCCACK) PRISM screen and verify his/her knowledge of the entry.  If the employee refuses to acknowledge a counseling, a witness (another member of management, a Human Resources representative, or a Human Resources manager) must immediately log onto the PRISM Online Documented Counseling Acknowledgment (OKCCACK) [sic] system to witness the counseling.

Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 8-9, 43.

The Manual also discusses suspensions:

> Investigative suspensions provide time to management to further investigate a violation.  The employee receives pay while on investigative suspension.  Management should hold the employee's I.D. badge while the employee is on an investigative or disciplinary suspension.  The employee receives notice of the suspension in writing.  An investigative suspension may be changed to a disciplinary suspension without pay as outlined in the <u>Disciplinary Suspension</u> section below and in the <u>Warning Letter/Recurrent Patterns</u> guideline.

> Investigative suspensions should be completed as soon as possible, normally within 7 calendar days.  The employee is informed of the decision within 7 calendar days of the completion of the investigation.

Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 7, 42.

With respect to terminations, the Manual provides in part:

**Termination Letter.** Involuntary termination letters must contain the following:
• Date of deficiency or incident
• Facts supporting termination
• Copy of policy that was violated
• Reference to employee's privilege to pursue Guaranteed Fair Treatment Procedure (GFTP)

Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 26. Before an employee may be terminated, "[t]wo levels of line management and a matrix Human Resources staff member must approve [the] discharge[]." Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 44.

In December 2001, the plaintiff was offered a position as ramp transport driver (RTD) at a Federal Express ramp in Seattle, Washington. Apparently he had been working for the defendant in Las Vegas at the time. In the original offer letter, the plaintiff was advised that his assigned schedule would be "Tuesday – Saturday, split shift, hours to be determined" and that the "hours [we]re subject to change to meet the business needs of the company." Def.'s Mot. Summ. J. Ex. F, Berry Dep. Exhibits (Ex. 1) at 1. In a split shift, an employee works several hours in the morning and another several hours in the evening, with time off in between.

Sharon Anderson was the plaintiff's manager during the evening part of his shift. The plaintiff testified that Ms. Anderson never made any comments that referred or related to his race. The plaintiff reported to manager Dave Berry during the morning part of his shift. The plaintiff testified that Berry, who is an African-American, never made any comments to the plaintiff that he deemed in any way race-related or discriminatory. The plaintiff worked with two dispatchers, Ernest Koon and Paul White, and reported that he never had any problems or conflicts with either of them. He said that neither Koon nor White made any statements to the plaintiff or took any actions that the plaintiff deemed to be related to or based upon his race.

The plaintiff states he was taken off split shift about two weeks after he started the Seattle job and switched to a night shift.  The plaintiff did not want to work nights and complained to Ms. Anderson.  When a split shift position opened up, the plaintiff hoped he would be re-assigned. However, the split shift position was given to Bill Stenger, a white employee with less seniority. A night shift employee apparently works forty hours per week, and a split shift employee works forty-seven hours per week.  The plaintiff complained to Edward Rasmussen about the shift change, and he was returned to a split shift position.

About two months later, the plaintiff's shift was changed again.  The defendant decided that the particular split shift that the plaintiff had been working should be staffed only by part time employees.  The plaintiff avers that his job was given to a part-time white employee, and he was given a different split shift position with fewer hours.

As an hourly employee, the plaintiff was required to record and code his time on a time card. The plaintiff was paid based on the hours entered on his time card.  The codes used to identify activity throughout the day are as follows:

On-Road and Break Hours Codes
. . .
| 13 | Begin Break |
| 14 | End Break |
| 17 | End On-Road Activity |
. . .
| 22 | Shuttle Activity |
. . .
| 28 | Begin Paid Break (Restricted) |
| 29 | End Paid Break (Restricted) |

At Location Hours Codes
| 39 | Miscellaneous |
| 40 | Pre-Post Trip Activity |
. . .
Other Non-Hours Codes

. . .
41      Change Location
42      Change Manager

Def.'s Mot. Summ. J. Ex. G, Anderson Decl. Ex. 1, Time Card Task Codes at 3.  Each day, a

manager reviews employee time cards to confirm that every employee has submitted a timecard for

that day.  The manager apparently does not routinely audit the cards for accuracy.

On May 1, 2002, the plaintiff met with Anderson and Berry to discuss his time card coding.

Berry and Anderson told the plaintiff that they had found discrepancies between his arrival time and

the time shown on his time cards.  Anderson gave the plaintiff a verbal counseling in connection

with time card discrepancies.  The plaintiff was told that an online counseling would be entered

reflecting the verbal counseling.  He was asked to acknowledge it, but he refused to do so.  In

accordance with policy, Anderson entered the following information about the counseling into the

computer system:

> DAVE BERRY/AM TRUCK MGR AND MYSELF [ANDERSON], HAD A
> DISCUSSION WITH AVERY IN REFERENCE TO CORRECT TIMECARD
> CODING.  I DID AN AUDIT OF AVERY'S TIMECARDS FROM O4/05 – 04/26,
> DISCOVERING A DISCREPANCY FROM ACTUAL ARRIVAL TIMES FROM
> STATION RUNS, TO THE 17/ENDING CODE ENTERED ON THE TIMECARD,
> VARYING AS MUCH AS AN HOUR.  AVERY WAS ADVISED OF THE
> UPCOMING STANDARDS FOR UNLOADING/PARKING/POSTTRIP AND
> TOLD THAT FROM THIS POINT ON, IT WOULD BE CONSIDERED
> FALSIFICATION, AVERY WAS CONCERNED ABOUT THE OTHER EE'S, HE
> WAS TOLD EVERYONE WAS BEING ADDRESSED IF TIMES OUT OF LINE.

Def.'s Mot. Summ. J. Ex. F, Berry Dep. Exhibits (Ex. 2) at 2-3.  Berry witnessed the entry because

of the plaintiff's refusal to acknowledge it himself.  After the May meeting, the plaintiff testified that

he continued coding his time cards the same way.  He explained that he believed that was acceptable

because Anderson continued to approve his time cards.  The plaintiff expressed the belief that the

time-card audit was in retaliation for his prior complaint to Edward Rasmussen about his shift change.

In September 2002, the plaintiff acknowledged receipt of a document entitled "Success Factors." The document included directions that each employee should "[a]ssure that all entries on your own time card are accurate." It also stated, in bold print:

> CONSIDER YOUR TIME CARD AS BILL [sic] TO THE COMPANY; WHEN YOU ARE BILLING THE COMPANY YOU ARE TO BE DOING WORK FOR THE COMPANY, NOT TAKING CARE OF PERSONAL MATTERS.

Def.'s Mot. Summ. J. Ex. C, Foster Dep. Exhibits (Ex. 20) at 41.

The cause for the plaintiff's termination, according to the defendant, were discrepancies on the plaintiff's time card for November 7, 2002. The plaintiff signed that time card on which he recorded entries using the activity codes prescribed by the defendant. The card reads:

| Code | Time |
| --- | --- |
| 41 | 0530 |
| 42 | 0530 |
| 40 | 0530 |
| 22 | 0610 |
| 17 | 0805 |
| 28 | 0805 |
| 29 | 0825 |
| 22 | 0825 |
| 17 | 0940 |
| 40 | 0940 |
| 13 | 0955 |
| 14 | 1700 |

Def.'s Mot. Summ. J. Ex. C, Foster Dep. Exhibits (Ex. 21) at 42. These codes translate into the following representations by the plaintiff for his activities that day: he began work at 5:30 a.m. and was involved in pre-trip activity; at 6:10 a.m. he commenced shuttle activity on the road, which concluded at 8:10 a.m.; then, according to the card, the plaintiff began a paid break from 8:05 a.m.

-10-

that concluded at 8:25 a.m.; he then went on a shuttle run from 8:25 a.m. to 9:40 a.m.; he was involved in post-trip activity after that.

The plaintiff explained at his deposition that when a driver is finished using his vehicle on a trip, he routinely conducts a post-trip inspection to ensure there are no problems with the vehicle. Dropping or unhooking the trailer is also part of the driver's post-trip activities. If a driver returned from a run and a dispatcher or manager asks him to stand by for further runs, the driver would leave the trailer hooked up to the tractor.

With respect to the November 7 time card, the defendant states that the plaintiff was not assigned a shuttle run at 8:25 a.m. In fact, Paul White, one of the defendant's dispatchers, did not have any more assignments for the plaintiff after 7:05 a.m. that day. White avers in his declaration that he told the plaintiff he was done for the day at 7:05 a.m., and the plaintiff should have clocked out then. Instead, the plaintiff says that he drove the company truck, without the trailer, to a store for a sandwich at 8:25 a.m:

> Q. Code 28 which begins, I guess, at 8:05, that's your – beginning your paid break?
> A. That's correct.
> Q. And code 29 at 8:25 is end your paid break?
> A. That's correct.
> Q. Then you got an 08:25, another shuttle run. Had you been assigned another shuttle run?
> A. No, that's when I left the location to go take my break. I departed from the ramp to go take my break.
> Q. Okay. And then you returned to the ramp at 09:40?
> A. Okay, wait a minute. What happened was the 22 was when I left from my break location. I was on the 28 at 08:05 is when I started my break and then 29 is when I left the location and then – when I ended my break at the location where I was taking my break and the 22 is when I actually physically got into the vehicle to come back to the ramp to end my break.
> Q. Come back to the ramp from where?
> A. From my lunch break, from my break.
> . . .
> Q. Well, between 8:25 and 9:40, what were you doing?

-11-

> A.  Yeah, that's when I was – the 22 is when I was leaving the location where I was taking my break to head back to the ramp.  See, my break was over with at 8:25.
> Q.  Correct.
> A.  And now I entered the vehicle and I went into a 22 and I headed back to the Seattle ramp and I got back to the ramp at 9:40.
> Q.  Where did you go during this break?
> A.  I went down to – it was basically a Mexican supermarket and they have a deli and I went there to have a sandwich.

Def.'s Mot. Summ. J. Ex. B, Foster Dep. at 85-87.  The plaintiff testified that he knew he was entitled only to a "20 minute paid break" at that point in his work day, and his time card coding resulted in paid time off from 8:05 a.m. to 9:40 a.m.  *Id.* at 115.  By coding his trip to the grocery store as a shuttle run, the plaintiff would be paid instead for one hour and thirty-five minutes of time that he was on a break.  The plaintiff acknowledged that unpaid breaks were to be coded as "13, 14." *Id.* at 62-63.  The plaintiff entered code 13 to show that he began an unpaid break at 9:55 a.m. between the first and second portions of his split shift and a 14 to show that he returned to work at 5 p.m.

The plaintiff claims he stayed on the clock because dispatcher Paul White told the plaintiff there might still be work for the plaintiff to do.  "Paul White told me, he said, Avery, I don't have anything for you to do right now but hold on . . . so I had to basically wait around and be on standby just in case something came up." *Id.* at 94.  The plaintiff also claims that Sharon Anderson told him to use code 22, which is supposed to be the shuttle activity code, even when he was not on a shuttle run.

> A.  Yes, I was told by Shari Anderson that she didn't want us to go into a 39 because it was a miscellaneous code and it would make her numbers look bad.
> Q.  What's a 39?
> A. 39 is like miscellaneous, like you're not driving, you're in the building, say you're unloading can or taking freight out of a can.

Def.'s Mot. Summ. J. Ex. B, Foster Dep. at 63-64.

-12-

David Berry saw the plaintiff return to the station from his first shuttle run at about 7:00 a.m. on November 7, 2002. He asked Paul White whether he had anything else for the plaintiff to do, and White said that he did not. When Berry saw the plaintiff leave the building around 9:30 a.m., he asked White again if he had assigned other work for the plaintiff, and White said that he had not. Curious about the plaintiff's activities between 7:00 a.m. and 9:30 a.m., Berry asked Anderson for a copy of the plaintiff's November 7 time card. Berry received the November 7 time card on the morning of November 8 and asked the plaintiff about several of his time card entries, specifically about the shuttle entry from 8:25 to 9:40. According to Berry, the plaintiff told him that he had gone to Safeway for a break during that time.

Berry told Anderson about his discovery of the plaintiff's time card discrepancies and the plaintiff's explanation. Berry and Anderson then met with Edward Rasmussen, the senior manager, to discuss the situation. Thereafter, Anderson wrote a letter to the plaintiff informing him that he was being put on paid investigative suspension, which she gave to the plaintiff when he returned for the second part of his shift on November 8. The plaintiff refused to sign the suspension letter, and Rasmussen signed as a witness to the plaintiff's refusal. When the plaintiff met with Anderson on November 8, he answered questions in writing, stating that he went to Safeway to take a break on November 7, 2002.

Federal Express completed its investigation of the plaintiff's time card discrepancies on November 15, 2002. Based on the results of the investigation and the plaintiff's prior counseling on the correct coding of time cards, Anderson concluded that the plaintiff deliberately falsified his time card on November 7, 2002. On November 21, 2002, Anderson met with the plaintiff and fired him for falsifying his time card.

-13-

The plaintiff argues that Anderson violated company policy by terminating him without the approval of two levels of line management and a matrix human resources employee as required by company policy. The defendant responds by pointing to Federal Express's Termination policy, which requires only that an involuntarily terminated employee be given a termination letter with certain specified content and does not require a termination meeting at all or with any particular members of management. In addition, the defendant submitted declarations from both Rasmussen and Rex Reeder, a human resources manager, stating they approved of the plaintiff's termination in advance.

The plaintiff testified that he believes his termination was based upon his race because he was told that Edward Rasmussen, the senior manager, had been investigated for racial discrimination in Oakland, California. However, the defendant insists that Rasmussen has never been employed by Federal Express in any capacity in Oakland, California, and Rasmussen avers that he has no knowledge of having ever been investigated for complaints of discrimination.

The plaintiff challenged his termination through Federal Express's Guaranteed Fair Treatment (GFT) policy. The plaintiff was allowed to proceed through all three steps as provided in the GFT policy. At the plaintiff's first step GFT meeting, he was offered an internal EEO packet to complete, which would initiate an internal investigation into any claims of discrimination that he had. The plaintiff declined the packet.

The plaintiff returned to Michigan and commenced this lawsuit in state court on March 25, 2004.

-14-

II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).  Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).  Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991

-15-

F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

-16-

must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quote marks omitted).

## A.

The plaintiff contends in his complaint that the employee handbook and other employment documents created a reasonable expectation on his part that he would not be terminated by the defendant absent just cause, and this expectation amounted to an implied contract. He says that the defendant breached that contract because Sharon Anderson led him to believe that he could code his time cards for break time in the manner he did. He also argues that the defendant violated its own policy when Anderson fired him on her own without the approval of two supervisors. The defendant contends that the plaintiff was an at-will employee who could be terminated without just cause. It claims that it had good cause to fire the plaintiff in any event because he falsified his time card. The defendant also offers the affidavits of two supervisors stating they approved the plaintiff's termination, and thereby the defendant conformed to the stated policy.

In Michigan, employment is presumed to be "at will," that is, terminable at the will of the employee or the employer. *Lynas v. Maxwell Farms*, 279 Mich. 684, 687, 273 N.W. 315, 316 (1937). However, it is well recognized that employers may enter into contractual relationships with their employees that limit the employer's ability to fire an employee without a valid reason to do so.

> Courts have recognized the following three ways by which a plaintiff can prove such contractual terms: (1) proof of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a "legitimate expectation" of job security in the employee.

*Lytle v. Malady*, 458 Mich. 153, 164, 579 N.W.2d 906, 911 (internal quotes and footnotes omitted).

-17-

The plaintiff in this case argues in his brief that statements made at his initial interview to the effect that he would always have a job at Federal Express as long as he was a good worker created a just cause contract. However, Michigan courts require express agreements concerning job security based on mutual assent to "be clear and unequivocal to overcome the presumption of employment at will." *Rood v. Gen. Dynamics Corp.*, 444 Mich 107, 119, 507 N.W.2d 591, 598 (1993) (quoting *Rowe v. Montgomery Ward & Co., Inc.*, 437 Mich. 627, 645, 473 N.W.2d 268, 275 (1991)). The question of mutual assent, in turn, calls for an examination of pre-employment negotiations and conduct under an objective test analyzing "all the relevant circumstances surrounding the transaction" to ascertain the nature and scope of traditional contract elements including offer, acceptance, and consideration. *See Rowe*, 437 Mich. at 641-44, 507 N.W.2d at 273-75; *Bullock v. Auto. Club of Mich.*, 432 Mich. 472, 481-84, 444 N.W.2d 114, 118-19 (1989). "[W]here an employer establishes a policy of discharge for cause, it may become part of an employment contract only when the circumstances (e.g., the language in the handbook itself, or an employer's oral statements or conduct) clearly and unambiguously indicate that the parties so intended." *Rood*, 444 Mich. at 137, 507 N.W.2d at 606.

In *Lytle*, the plaintiff alleged that she was approached by her supervisor at a time when the plaintiff considered resigning, and her supervisor told her that her job was secure and she would be considered for advancement. The court held that these words did not create a just cause contract or rebut the presumption of an at-will relationship. Rather, the court found "that these statements can only reasonably be interpreted as expressions of 'optimistic hope' for a long and satisfying employment relationship." *Lytle*, 458 Mich. at 171-72, 579 N.W.2d at 914. Similarly, in this case

-18-

the plaintiff has not offered any evidence that Federal Express clearly and unequivocally agreed to terminate its employees, and specifically, the plaintiff, absent just cause.

However, the plaintiff spends little time on this theory, choosing instead in its brief to concentrate on the third method of overcoming the presumption of at-will employment: that Federal Express's policies created a legitimate expectation of just cause employment, thereby creating a contract implied at law. In fact, in his complaint the plaintiff pleads only this (implied) contract theory of liability. *See* Am. Compl. at ¶¶ 26-27. The plaintiff faces substantial obstacles in succeeding on that claim, and he has not overcome them.

The implied contract theory was described in the watershed case of *Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 292 N.W.2d 880 (1980), as follows:

> [W]here an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does is matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation."

*Id.* at 613, 292 N.W.2d at 892.

This now well-established "handbook exception" to the employment-at-will doctrine, *see In Re Certified Question (Bankey v. Storer Broad. Co.)*, 432 Mich. 438, 448, 443 N.W.2d 112, 116 (1989), recognizes that employees may hold employers to enforcement of policy terms relating to job security as long as the policy remains in effect. *Id.* at 454-55, 443 N.W.2d at 119. Of course,

-19-

not all employee manuals clearly articulate a termination for just cause policy in so many words, even where such a policy might be inferred from the manual.  Consequently, Michigan courts have developed a two-step approach for evaluating legitimate expectation claims under *Toussaint*'s implied contract cause of action.  "The first step is to decide what, if anything, the employer has promised, and the second requires a determination of whether that promise is reasonably capable of instilling a legitimate expectation of just-cause employment."  *Lytle*, 458 Mich. at 164-65, 579 N.W.2d at 911 (internal quotes omitted).  However, "[w]hen an employment contract expressly provides for employment at will, a plaintiff, by signing the contract, assents to employment at will and cannot maintain an action based on a prior oral agreement for just-cause employment."  *Nieves v. Bell Indus., Inc*., 204 Mich. App. 459, 463, 517 N.W.2d 235, 238 (1994).  In *Nieves*, the court rejected a legitimate expectations claim where the "job application, handbook, and compensation agreement all promised at-will employment."  *Nieves v. Bell Indus., Inc*., 204 Mich. App. 459, 464, 517 N.W.2d 235, 238 (1994).

In *Rood*, the court expounded the first-step inquiry beginning with the definition of "promise" taken from *Restatement of Contracts (Second)* § 2(1), which is "a manifestation of intention to act or refrain from acting in a *specified way*, so made as to justify a promisee in understanding that a commitment has been made."  *See Rood*, 444 Mich. at 138-39, 507 N.W.2d at 606-07 (emphasis in original).  The court then explained:

> As is readily apparent, not all policy statements will rise to the level of a promise. For instance, an employer's policy to act or refrain from acting in a specified way *if* the employer chooses is not a promise at all.  Also apparent in the definition of a promise is the need for specificity.  The more indefinite the terms, the less likely it is that a promise has been made.  And, if no promise is made, there is nothing to enforce.

-20-

*Id.* at 139, 507 N.W.2d at 607 (emphasis in original).  The court cited the employee handbooks in *Toussaint* and *Renny v. Port Huron Hosp.*, 427 Mich. 415, 398 N.W.2d 327 (1986), as examples of specific policy statements which created an enforceable promise.  In *Toussaint*, there was an express provision that employees would be terminated "for just cause only," and in *Renny*, the handbook contained a list of offenses along with appropriate penalties together with a statement that the employer's right to terminate was expressly "subject to" the restrictions in the handbook.

Perhaps more enlightening, however, is the court's treatment of the companion claim in *Rood*, which involved a truck driver employed by the SPX Corporation who claimed a breach of an implied just cause agreement.  That truck driver, Joseph Schippers, was fired after he was involved in an accident.  SPX's employee handbook did not contain an express statement that termination would only occur for just cause.  It did contain a provision allowing termination of employees during their initial sixty-day probationary period, a list of prohibited practices that "may" result in "disciplinary action up to and including discharge," which included involvement in "chargeable accidents," and a disclaimer that provided that the company reserved the right to change its policies at any time.  There also was testimony of an informal policy that management required "good reason" before discharging an employee.  *Rood*, 444 Mich. at 120-22, 507 N.W.2d at 598-99.  The court found that no just cause contract was implied on these facts.  *Id.* at 141, 507 N.W.2d at 607.  Although there was a promise by the company to treat the employees fairly, the court held that "[a] promise of fairness, without more, is too vague to judicially enforce."  *Id.*  Similarly, the court found that a "probationary period for newly hired employees is likewise insufficient to overcome the presumption of employment at will."  *Id.*  Finally, as to the list of offenses and conduct that could result in termination, the court held that "[a] nonexclusive list of common-sense rules of behavior

-21-

that can lead to disciplinary action or discharge, clearly reserves the right of an employer to discharge an employee at will." *Id.* at 142, 507 N.W.2d at 608.

The plaintiff in this case fails to point to specific language in the defendant's handbook and policies that he believes constitutes a promise only to terminate him for just cause. He states only that "he was a 'just cause' employee at the time of his termination by virtue of the Acceptable Conduct Policy as well as the Guaranteed Fair Treatment Policy." Pl.'s Resp. Br. at 9. Nowhere in the Acceptable Conduct Policy does the defendant promise that employees will be terminated only for just cause. To the contrary, the Acceptable Conduct Policy states,

> The employment relationship between the Company and any employee may be terminated at the will of either party as stated in the employment agreement signed upon application for employment. As described in that agreement, the policies and procedures set forth in this manual provide guidelines for management and employees during employment but do not create contractual rights regarding termination or otherwise.

Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 10, 45. The defendant's Guaranteed Fair Treatment Policy likewise states, "As described in the employment agreement signed upon application for employment, the policies and procedures set forth by the Company provide guidelines for management and other employees during employment, but do not create contractual rights regarding termination or otherwise." Pl.'s Resp. Ex. 7, Guaranteed Fair Treatment Policy at 6. Nowhere does that policy state that employees will be terminated only for just cause. Employees are guaranteed the right to participate in the GFTP process, but "the outcome is not ensured to be in the employee's favor." *Id.* at 1.

More importantly, the plaintiff agreed in writing at least five times that he was an at-will employee: in his employment application and four handbook acknowledgments. Most recently, on

-22-

February 20, 2002, the plaintiff agreed that the defendant's handbook "is not a contract of employment, nor should its provisions be read or implied to provide for one." Def.'s Mot. Summ. J. Ex. C, Foster Dep. Exhibits (Ex. 9) at 25. The acknowledgment forms notified the plaintiff that his "specific rights as an employee are governed by the Employment Agreement [he] signed in [his] employment application." *Ibid.* That application, which the plaintiff signed on September 4, 1990, states, "I also agree that my employment and compensation can be terminated with or without cause and without notice or liability whatsoever, at any time, at the option of either the company or myself. . . . Nothing in this agreement or any other communication from the Company shall abrogate this employment-at-will status." Def.'s Mot. Summ. J. Ex. C, Foster Dep. Exhibits (Ex. 5) at 21, ¶ 11. These facts are undisputed. There is no evidence in this record that would permit the plaintiff to avoid the rule stated in *Nieves v. Bell Industries, Inc*., quoted above, that bars an action based on legitimate expectations arising from oral representations when the "employment contract expressly provides for employment at will." *Nieves* , 204 Mich. App. at 463, 517 N.W.2d at 238.

But even if Foster could not be fired except for just cause, his termination would not have breached such an agreement. The employee handbook states that "deliberate falsification of applications or other Company-related documents" "may result in severe disciplinary action up to and including discharge." Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 6, 41. The time card is a "Company-related document," and the plaintiff admitted he was taking a break from 8:25 to 9:40 a..m. on November 7, 2002 for which he was not entitled to be paid, and he coded it as a shuttle run, which was paid time.

-23-

The plaintiff argues in his brief that Anderson told him to continue coding his breaks as paid time. However, this position is contradicted by the plaintiff's own testimony. He said he knew unpaid breaks ought to have been coded as 13 or 14, not 22:

> A.  You could take – as paid break, you could take, I think it was 20 minutes and then an unpaid break, I guess you could break as long as you want, you're not getting paid for it.
> Q.  And how would you code that on your time card, unpaid break?
> A.  13, 14.

Def.'s Mot. Summ. J. Ex. B, Foster Dep. at 62-63. The plaintiff had been counseled previously about his time card coding. Both Anderson and Berry "had a discussion with Avery in reference to correct timecard coding" and told him "that from this point on, it would be considered falsification." Def.'s Mot. Summ. J. Ex. F, Berry Dep. Exhibits (Ex. 2) at 2-3. The plaintiff also acknowledged receipt of a document equating a time card to an invoice to the company. He had been warned that the company took time abuse seriously and violations could result in termination.

The plaintiff's deposition also contradicts his claims that he coded certain events as 22 instead of the appropriate code because Anderson told him to do so: he admitted that Anderson told him to use code 22 instead of 39, the miscellaneous code. Thirty-nine would normally be used for work that did not fall into any other category, "like you're not driving, you're in the building, say you're unloading can or taking freight out of a can." Def.'s Mot. Summ. J. Ex. B, Foster Dep. at 64. However, there is no evidence suggesting Anderson told the plaintiff to use code 22 instead of code 13 or 14, which are to be used for unpaid breaks. According to the plaintiff's own testimony, Anderson's instructions would not have guided him to use paid-time codes for unpaid breaks.

The plaintiff also claims he stayed on the clock because dispatcher Paul White told the plaintiff there might still be work for the plaintiff to do. "Paul White told me, he said, Avery, I don't

-24-

have anything for you to do right now but hold on. . . . so I had to basically wait around and be on standby just in case something came up."  Def.'s Mot. Summ. J. Ex. B, Foster Dep. at 94.  However, the plaintiff's own testimony and actions contradict that claim.  Even if White had asked him to stay on the clock, the plaintiff was unavailable to perform further work because he left the facility.  Furthermore, the plaintiff testified that when a dispatcher or manager asks a driver to stand by for further runs, the driver should leave the trailer hooked up to the truck.  Yet the plaintiff removed the trailer from his truck prior to leaving the facility to take his break.  Further, White's affidavit states: "When Avery came to the dispatch office at 7:05 a.m. to get another assignment, I instructed him that I had nothing else for him to do, and that he was done for the day which is a known indicator amongst all the SEAR RTD Drivers to get off the clock as soon as they administer a post trip and park their vehicles."  Def.'s Mot. Summ. J. Ex. J, White Decl. Ex. A.  No reasonable jury could conclude that the plaintiff stayed on the clock to be available in case White needed assistance because the defendant left the facility and unhooked his trailer.

The undisputed facts establish just cause for the termination even if that standard was not contractually required.

Finally, the plaintiff claims that the defendant made a promise apart from the just cause representation to follow its termination procedures, which included the requirement that two supervisors approve a termination before it can become effective.  He says that Sharon Anderson acted on her own when she fired him in violation of that policy.  He now bases that claim on her deposition testimony in which she stated:

> Q.  Ms. Anderson, did you have any discussions with Mr. Rasmussen before Mr. Foster's termination regarding this situation?
> A.  Yes.
> Q.  And just tell me what discussions you had with him.

A.  It was just basically telling him what had transpired and what – what the next action would be, the investigation.  And then after the investigation, I let him know that I needed – that I will be terminating Mr. Foster's employment.

Q.  Did he tell you to – I was going to say "he."  Did Mr. Rasmussen ever tell you to terminate Mr. Foster's employment?

A.  No.

Q.  Are you aware of a policy that requires a senior manager being present during an employee's termination?

A.  No.

Q.  Do you have any knowledge of whether the – well, strike that.  When you gave the termination letter to Mr. Foster, was anyone else with you at that time?

A.  Yes.

Q.  Who was there?

A.  Another manager, Heidi Urban; and security.

Q.  Was Ms. Urban's position operations manager?

A.  Yes, it was.

. . .

Q.  Heidi Urban, operations manager.  Well, was Heidi Urban your operations manager?

A.  No.

Q.  But she shows up at this meeting?

. . .

A.  Yes.

Q.  And who was supposed to show up at the meeting?  Mr. Rasmussen?

A.  Not – no.

Q.  Well, wasn't he your manager?

A.  He was my manager, yes.

Q.  Remember the question that your counsel asked as to whether or not a senior manager was supposed to be present at that meeting?

A.  And I answered, "I was not aware of that."

Q.  You didn't even know that?

. . .

A.  I do not know that that's a policy at FedEx.

Q.  Yet, Mr. Rasmussen had to be consulted by you all along the way, didn't he?

A.  No.

Q.  Well, he had to be consulted when you originally were investigating, right?  You talked to him?

A.  We made him aware.

Q.  You told me that you talked to him and actually you told your counsel for Federal Express that you talked to him, remember?

A.  I talked to him to let him know what was going on.

Def.'s Mot. Summ. J. Ex. H, Anderson Dep. at 47-48, 63-64.

This testimony is ambiguous at best and does not establish that Anderson acted on her own. The defendant submitted declarations by Edward Rasmussen and Rex Reed averring that they gave advance approval to the termination after Anderson completed the investigation. These affidavits are unrebutted. The defendant suspended the plaintiff while an investigation was conducted, and then Anderson terminated the plaintiff with the approval of Rasmussen and Reeder, human resources manager, Def.'s Reply Ex. A, Rasmussen Decl. at ¶ 6; Ex. B, Reeder Decl. at ¶ 6, as prescribed by the defendant's policy. *See* Def.'s Mot. Summ. J. Ex. D, Linda Carter Decl. and Exhibits at 44 (requiring that "Two levels of line management and a matrix Human Resources staff member must approve all discharges based on misconduct when the individual holds a managing director or below position"). Apparently Anderson was not aware of the company policy, but it appears that she unwittingly complied with it. The plaintiff has no basis to premise his wrongful termination claim on the breach of that policy.

B.

The defendant argues that the plaintiff's race discrimination claim must fail because the plaintiff has failed to show that other employees outside the protected class were treated differently than he. As a consequence, the defendant contends, the plaintiff cannot establish a *prima facie* case under the three-step *McDonnell Douglas* methodology for proving discriminatory intent by circumstantial evidence. Moreover, the defendant argues, it had a legitimate, non-discriminatory reason for firing the plaintiff that has not been shown to be pretextual.

The plaintiff argues that he is not required to show that he was treated differently than someone of another race. He is only required to show that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. The plaintiff believes

-27-

he has met this requirement by submitting deposition testimony that Sharon Anderson told the plaintiff to use code 22 for non-shuttle run tasks, and that Anderson previously removed the plaintiff from his split shift and gave it to a white employee. Finally, the plaintiff claims a co-worker told him, at Anderson's direction, that Edward Rasmussen had been investigated for race discrimination.

Michigan's Elliott-Larsen Civil Rights Act prohibits an employer from "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race." Mich. Comp. Laws § 37.2202(1)(a). As is the case under federal civil rights statutes, the elements of a civil rights claim under Michigan law may be proved by direct or circumstantial evidence. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462, 628 N.W.2d 515, 520 (2001). Michigan courts frequently "turn to federal precedent for guidance in reaching [their] decision" to determine whether a claim has been established in discrimination cases. *Radtke v. Everett*, 442 Mich. 368, 382, 501 N.W.2d 155, 162 (1993) (quoting *Sumner v. Goodyear Tire and Rubber Co.*, 427 Mich. 505, 525, 398 N.W.2d 368, 376 (1986)). For analytical purposes, Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as in the analogous Federal Civil Rights Act cases. *See Hazle*, 464 Mich. at 462, 628 N.W.2d 515; *Jenkins v. Southeastern Mich. Chapter, Am. Red Cross*, 141 Mich. App. 785, 793 n. 2, 369 N.W.2d 223, 227 n. 2 (1985); *Gallaway v. Chrysler Corp.*, 105 Mich. App. 1, 4-5, 306 N.W.2d 368, 370-71 (1981).

If the plaintiff proceeds on a circumstantial evidence case, he "must then proceed through the familiar steps set forth in *McDonnell Douglas*." *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462, 628 N.W.2d 515, 520 (2001). This requires the plaintiff to "offer a 'prima facie case' of discrimination." *Hazle v. Ford Motor Co.*, 464 Mich. 456, 463, 628 N.W.2d 515, 521 (2001). If

-28-

the plaintiff meets this burden, "the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Id.*, at 464, 628 N.W.2d at 521.  The plaintiff then has the opportunity to show that the reason put forth by the defendant is a pretext for unlawful discrimination.

At the summary judgment stage, a "plaintiff was required to present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." *Id.* at 463, 628 N.W.2d at 521.  Regarding the fourth factor, the Michigan Supreme Court has stated:

> While a plaintiff is not required to show circumstances giving rise to an inference of discrimination in any one specific manner, the plaintiff's burden of production remains to present evidence that the employer's actions, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine, supra* at 253, 101 S.Ct. 1089. In short, a plaintiff must offer evidence showing something more than an isolated decision to reject a minority applicant.

*Id.* at 470-71, 628 N.W.2d at 525.  Where a plaintiff "fail[s] to show that any similarly-situated non-protected class employees were treated differently, Plaintiff has failed to make out a *prima facie* case of discrimination."  *Millner v. DTE Energy Co.*, 285 F. Supp. 2d 950, 969 (E.D. Mich. 2003).

As to the demonstration of pretext,

> Michigan law imposes a higher burden on plaintiffs after the employer has presented a legitimate, non-discriminatory reason for its employment actions. Specifically, Michigan law requires that the plaintiff show that the employer's stated reason is pretext for discrimination. *See Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906, 916 (Mich.1998). In *Lytle*, the court stated:

> > [D]isproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a

-29-

> motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for . . . discrimination.
>
> *Id.* Although *Lytle* was issued before *Reeves*, it appears that *Lytle* is still good law with respect to this issue in Michigan.

*Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 438-39 (6th Cir. 2002).

The parties agree that the plaintiff has offered sufficient evidence on the first three elements of the *prima facie* case. However, he cannot show that he was terminated under circumstances giving rise to an inference of unlawful discrimination. Although there is not "any one specific manner" in which a plaintiff must circumstantially prove discrimination, perhaps the most common method is to show that he was treated differently than employees of other races. The plaintiff has come forward with no such proof in this case. The plaintiff never examined other employees' time cards. Although he spoke with other employees about time cards, he did not ask specific questions about how they coded shuttle runs or breaks, and he does not recall the name of any employee with whom he spoke. Another employee, Ernest Koon, was disciplined for an avoidable accident; at the time of the accident, Mr. Koon was on an unpaid break. Mr. Koon never coded his timecard to reflect a lunch break as a shuttle run. However, Mr. Koon is African American and therefore not outside the protected class.

The plaintiff has not presented any evidence of racial animus by supervisory employees. He testified that another employee told him that he had heard from Sharon Anderson that Edward Rasmussen had been investigated for race discrimination in Oakland, California. But this evidence is not competent because it is inadmissible hearsay, and, in light of the disclosure that Rasmussen never worked in Oakland, California, its probative force is nil.

-30-

The plaintiff also argues that this prong is satisfied because Anderson told him to use code 22 even when he was not on a shuttle run then fired him when he complied with her directions. However, as noted earlier, Anderson never told the plaintiff to use code 22 instead of 13, 14 for unpaid breaks. The plaintiff's own deposition testimony suggests that Anderson told the plaintiff to use code 22 instead of 39, the miscellaneous provision, when he was doing certain types of work. Even the plaintiff could not say that Anderson counseled him to code unpaid breaks so that he could get paid for the time. This evidence does not give rise to an inference of racial discrimination.

Even if the plaintiff could meet the prima facie case requirements, the defendant has articulated a legitimate nondiscriminatory reason for its employment decision. The plaintiff committed time card fraud by putting the wrong code on his time card, resulting in his being paid while he was conducting personal business. The plaintiff has not shown that this reason is a pretext for unlawful discrimination, either by offering evidence that the employer treated similarly-situated employees outside the protected class, *Lytle v. Malady*, 458 Mich. 153, 178, 579 N.W.2d 906, 917 (1998), or with evidence that the proffered reason did not actually motivate the termination or was insufficient to justify the adverse employment action. *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 711-12, 565 N.W.2d 401, 411 (1997).

The plaintiff claims the defendant's violation of its own policies suggests unlawful discrimination was the reason for the termination. It is true that a company's violation of its policies can be evidence of pretext. *DeBoer v. Musashi Auto Parts, Inc*., 124 Fed. Appx. 387, 394 (6th Cir. 2005) (unpublished). However, the Court has found that the undisputed facts show that the defendant complied with all of its policies. Company policy allows for termination upon deliberate falsification of company documents. There is ample evidence that the plaintiff committed this

-31-

offense.  Company policy also states two managers must approve of a termination for misconduct.

Mr. Rasmussen and Mr. Reeder both approved the termination.

The plaintiff finally claims that Ms. Anderson's prior act of removing him from the split shift

and giving the position to a white employee suggests race discrimination is the true reason for his

termination.  There is no evidence that this prior shift change was motivated by race, and the prior

act in no way suggests that the plaintiff's time abuse was not the real reason for his termination.

There is no merit to the plaintiff's race discrimination claim.  The defendant is entitled to

summary judgment as a matter of law.

C.

In his motion response, the plaintiff states that discovery has revealed evidence of retaliation,

and he suggests that he may want to amend his complaint to so allege.  The plaintiff has never filed

a motion to amend the complaint, although this motion has been pending since February 2, 2006.

He says that the evidence of retaliation is found in his own deposition testimony, where he testified:

> Q. Did you ever have any conflicts with Shari Anderson?
> A.  Yes, I did.
> Q. Can you describe this for me?
> A.  Okay, my offer letter stated that I was going to be working split shift when I
> arrived to the location and when I got there, I may have worked split shift for maybe
> two weeks, then they put me on nights and I told her I didn't agree with going on
> nights but you know, I would work with her and work nights and she said well, that's
> where she needs me to work is on nights at the moment.  And then later on, a split
> shift position came open and she upgraded a part time RTD driver to full time and
> she put him on split shift and I talked with her, I asked her why come she didn't offer
> it to me first because it was stated in my offer letter that I would be working split
> shift and on top of that, that I was senior to the other guy that got upgraded and was
> put on split shift.  And then she didn't do anything about it, so I walked over to Ed
> Rasmussen's office and reported it to him and he told me he would talk to Shari and
> the next couple of weeks, they switched us around.
> Q. Who was the person you referred to who was upgraded?
> A.  Bill Stringer.  It's either Bill Stringer or Bill Stinger but I think it's Stringer.
> . . .

-32-

Q.  Were there any other specific conflicts that you had with Shari?
A. Well, after I filed a complaint with Ed Ras – it was a verbal complaint but after I filed that complaint, then everything went downhill.  I couldn't do anything right anymore.
. . .
Q. Did at some point Federal Express change your situation?
A.  Yes, they did.
Q.  And did that cost you money?
A.  Yes, it did.
Q.  And how much hours did you – when did they renege on that portion of the agreement, as far as you were concerned?
A.  They reneged on the agreement when they upgraded a part time into full time and put him in that slot without offering the position to me first because I was a senior employee.
Q.  Do you believe that was in part discriminatorily based?
A.  Yes, I do.
Q.  Was the person that got the slot that was part time white?
A.  Yes, he was.
Q.  Did you complain about that to your immediate line supervisor?
A.  Yes, I did.
Q.  What was the – and who was that person again?
A.  I complained to Ed Rasmussen, the senior manager.
Q.  And did you have to go – was that changed or did you prevail on that or what happened?
A.  I prevailed on that.  They changed it over – they took him out of the slot and then put me into the slot.
Q.  Did that cause, at least from your perspective, do you believe that it was after that point that you – that they began to retaliate against you?
A.  That's correct, I do believe that.
Q.  And who was it that was retaliating?
A.  Shari Anderson.

Def.'s Mot. Summ. J. Ex. B, Foster Dep. at 48-49, 171-72

Under Federal Rule Civil Procedure 15(a), a party may amend at this stage of the proceedings only after obtaining leave of court.  Although the Rule provides that "leave of court shall be freely granted when justice so requires," leave may be denied on the basis of undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party.  *Foman v. Davis*, 371

U.S. 178, 182 (1962); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997). The defendant argues that amendment would be futile. The Court agrees. The Court also finds that the request comes too late.

To prevail on a retaliation claim, the plaintiff must make out a prima facie case by presenting evidence

> (1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a "significant factor" in the employer's adverse employment action, not just that there was a causal link between the two.

*Barrett v. Kirtland Cmty Coll.*, 245 Mich. App. 306, 315, 628 N.W.2d 63, 70 (2001) (citation omitted).

The deposition testimony cited by the plaintiff does not demonstrate that his complaint about the change in shift assignments was referable to race discrimination in any way. Although a Michigan employee "need not specifically cite the CRA when making a charge under the act," the worker "must do more than generally assert unfair treatment." *Id.* at 318-19, 628 N.W.2d at 72 (citing *Mitan v. Neiman Marcus*, 240 Mich. App. 679, 682, 613 N.W.2d 415 (2000)). In order to prove that he engaged in protected activity, an employee must "clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to the CRA." *Barrett*, 245 Mich. App. at 319, 628 N.W.2d at 72.

Since the plaintiff would not be able to establish a *prima facie* case of retaliation, allowing an amendment to plead that claim would be an act of futility. Moreover, this information was within the plaintiff's knowledge irrespective of the formal discovery that took place in this case. The

plaintiff has not offered a credible explanation for his delay in mentioning a desire to amend until he filed his response to the defendant's dispositive motion, or why even through today he has not filed a motion to amend the complaint.

III.

The Court finds that the undisputed facts demonstrate that there is no implied contract of employment mandating that the plaintiff would not be terminated absent just cause, or that the defendant violated its procedures in terminating the plaintiff. There likewise is no evidence of race discrimination. The defendant is entitled to a judgment in its favor as a matter of law.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt # 40] is **GRANTED**.

It is further **ORDERED** that the several motions *in limine* filed by the defendant [dkt #s 41, 42, 43, 44, 45] are **DENIED as moot**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 3, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 3, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS

---